**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

RAYMOND E. NESMITH,       )
                                   )
              Plaintiff     )
                                   )      Civil Action No. 10-1321
              v.            )
                                   )      Judge Nora Barry Fischer
COMISSIONER OF         )
SOCIAL SECURITY,       )
                                   )
            Defendant   )

## MEMORANDUM OPINION

## I. INTRODUCTION

Raymond E. Nesmith ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying his application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381 - 1383f ("Act"). This matter comes before the court on cross motions for summary judgment. (ECF Nos. 8, 10). The record has been developed at the administrative level. For the following reasons, Plaintiff's Motion for Summary Judgment is DENIED, and Defendant's Motion for Summary Judgment is GRANTED.

## II. PROCEDURAL HISTORY

Plaintiff filed for DIB and SSI with the Social Security Administration September 13, 2007, claiming an inability to work due to disability as of March 1, 2006. (R. at 112 – 25)[1]. Plaintiff was initially denied benefits on December 18, 2007. (R. at 58 – 67). A hearing was scheduled for August 19, 2009, and Plaintiff appeared to testify represented by counsel. (R. at 22 – 54). A vocational expert, David Zak, also testified. (R. at 22). The Administrative Law Judge ("ALJ"), William H. Hauser, issued his decision denying benefits to Plaintiff on October 2, 2009. (R. at 6 – 21). Plaintiff filed a request for review of the ALJ's decision by the Appeals Council, which request was denied on August 23, 2010, thereby making the decision of the ALJ the final decision of the Commissioner. (R. at 1 – 5).

Plaintiff filed his Complaint in this court on October 8, 2010. (ECF No. 3). Defendant filed his Answer on February 22, 2011. (ECF No. 5). Cross motions for summary judgment followed. (ECF Nos. 8, 10).

## III. STATEMENT OF THE CASE

### A. General Background

Plaintiff was born on June 3, 1987, and was twenty-three years of age at the time of his administrative hearing. (R. at 30, 135). Plaintiff left high school in the tenth grade, but later obtained his GED in 2005. (R. at 30, 143). Plaintiff successfully completed a nine month training course to become a motorcycle mechanic in April of 2007. (R. at 33, 143). Plaintiff still resided with his parents. (R. at 32). Plaintiff's employment history included several months as a laborer for a Super Rite food distribution business, line server at an Old Country Buffet restaurant, stocker and worker in the lawn and garden section at two Wal-Mart stores, and as an

---

1       Citations to ECF Nos. 6 – 6-7, the Record, *hereinafter*, "R. at __."

order selector at a Super Value store. (R. at 33 – 34, 140, 146, 190).  He quit past employment because of alleged stress and difficulties with co-workers. (R. at 161).

Plaintiff applied for benefits claiming disability as a result of a seizure disorder, depression, anxiety, asthma, and post-traumatic stress disorder ("PTSD"). (R. at 139, 165). Plaintiff stated that he had not suffered a seizure since February 26, 2007. (R. at 165).  He complained that his alleged disabilities hampered his memory, comprehension, concentration, ability to complete tasks, work pace, and ability to get along with others. (R. at 155 – 63).  He claimed that he could not be alone, that he suffered from panic attacks, and that he angered easily. (R. at 155 – 63).  He could have three to four panic attacks a day for up to forty five minutes at a time. (R. at 163).  Plaintiff claimed he often had difficulty falling asleep at night, and often was unmotivated to get out of bed in the morning. (R. at 155 – 62).

However, at the time of his application for benefits, Plaintiff reported that he spent a typical day playing computer games, watching television, napping, visiting friends, helping his friends care for their animals, performing household chores for his parents such as cleaning and mowing the lawn, and caring for his own miniature chickens by feeding them and cleaning their pens. (R. at 155 – 57).  Plaintiff would go outside daily on his own, was capable of driving, but typically walked, would go shopping for personal items or window-shop to check out new electronics, and could pay his bills, count change, and handle savings and checking accounts. (R. at 158).  Plaintiff's hobbies included motorcycles and hunting, and he would go hunting with others. (R. at 159).  He stated that his alleged disabilities had not affected his hobbies or interests. (R. at 159).  Plaintiff was engaged in social activities with friends and family every week. (R. at 159).  Further, his social activities had not been affected by his alleged disabilities. (R. at 160).

B. <u>Medical History</u>

Plaintiff was admitted to Conemaugh Valley Memorial Hospital on February 24, 2007 following a reported seizure. (R. at 196). While the seizure was not witnessed, Plaintiff was found in his home in a semi-conscious state having suffered some minor injuries. (R. at 196, 198, 200, 223). While at the hospital, Plaintiff underwent a battery of diagnostic tests. (R. at 196). Tests of the head, brain, and spine revealed largely unremarkable results. (R. at 196 – 98, 208 – 22, 297). An electroencephalogram ("EEG") did return results indicating the potential for seizures. (R. at 197, 297). Hospital records indicated that Plaintiff had taken medication and was drinking prior to the seizure. (R. at 200 – 01, 219, 223). While the treating physicians concluded that the seizure was most likely induced by drugs, Plaintiff's medical history included a motorcycle accident three years prior and a car accident three weeks prior. (R. at 198, 201, 203). Plaintiff was discharged from the hospital on February 27, 2007. (R. at 196). Upon release from the hospital, Plaintiff was advised not to drive for at least six months, and the Pennsylvania Department of Motor Vehicles was notified of the incident. (R. at 196, 199).

Plaintiff's primary care physician, Molly Trostle, D.O., began seeing Plaintiff for psychological issues on August 31, 2007. (R. at 279). At that appointment, Plaintiff complained of panic attacks, increased anxiety, and increased depression. (R. at 279). Dr. Trostle prescribed Buspar[2] and Prozac[3] for treatment. (R. at 279).

The record shows that in September of 2007, Plaintiff made his only recorded attempt to engage in individual counseling with mental health professionals. (R. at 226). Plaintiff was seen

_____

[2]    Buspar, also known as, "buspirone," is a medication for treatment of anxiety disorders and/ or the short-term treatment of anxiety related symptomology. PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000876/ (last visited May 23, 2011).

[3]    Prozac, also known as, "fluoxetine," is an antipsychotic medication used to treat psychiatric disorders such as schizophrenia, bipolar disorder, obsessive compulsive disorder, some eating disorders, and panic attacks. It may also be used for treatment of PTSD. PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000885/ (last visited May 23, 2011).

by Megan Miller, M.A. at the Community Guidance Center ("guidance center") for an initial evaluation and to develop a treatment plan. (R. at 226). While there, Plaintiff described being sexually molested by an older male cousin on a weekly basis from the age of three until the age of fourteen. (R. at 226). Plaintiff had never spoken of the abuse until March of 2007. (R. at 226). Plaintiff also described illicit drug and alcohol abuse beginning in high school. (R. at 226). He claimed to have been sober for approximately one month prior to his evaluation. (R. at 226). Plaintiff suffered from feelings of hopelessness, worthlessness, decreased energy, and anxiety. (R. at 226). He was easily distracted and had difficulty falling asleep at night; although, during the course of a normal day, Plaintiff purportedly slept from ten to twelve hours. (R. at 226). Plaintiff also claimed to suffer three to four panic attacks a day, and described the episodes as feeling like a heart attack. (R. at 226).

Ms. Miller diagnosed Plaintiff with recurrent, moderate major depressive disorder, chronic PTSD, a history of alcohol abuse, a history of opioid abuse, and a history of cannabis abuse in early full remission. (R. at 226). Plaintiff was assessed a global assessment of functioning[4] ("GAF") score of 44. (R. at 226). Plaintiff was recommended for individual therapy to deal with flashbacks related to his history of sexual abuse, and for medication management with a psychiatrist. (R. at 227). Plaintiff never returned to the guidance center to follow through with his treatment plan.

---

4      The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000). An individual with a GAF score of 60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning;" of 50 may have "[s]erious symptoms (e.g., suicidal ideation ....)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job);" of 40 may have "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood"; of 30 may have behavior "considerably influenced by delusions or hallucinations" or "serious impairment in communication or judgment (e.g., ... suicidal preoccupation)" or "inability to function in almost all areas ...; of 20 "[s]ome danger of hurting self or others ... or occasionally fails to maintain minimal personal hygiene ... or gross impairment in communication...." *Id.*

Plaintiff returned to see Dr. Trostle on October 3, 2007, again complaining of increased depression and anxiety, and seeking something to help him sleep. (R. at 277 – 78). Dr. Trostle was concerned at that time because over the past several months Plaintiff had been placed on several medications for treatment of his psychological conditions, but reported no relief. (R. at 276 – 78). At that time, however, Plaintiff did report to Dr. Trostle that he felt that taking Effexor[5] had helped him, and Dr. Trostle again placed Plaintiff on that medication and would wean Plaintiff off of Prozac. (R. at 277 – 78). Dr. Trostle also advised Plaintiff to continue with individual therapy, because he could not expect complete relief from his psychological disturbance with pills, alone. (R. at 277 – 78).

Plaintiff returned to Dr. Trostle's office on December 31, 2007. (R. at 275). The doctor indicated that Plaintiff reported routinely engaging in mental health treatment. (R. at 275). She continued him on prescription medications, but noted that he had experienced seizure activity with the medication Cymbalta[6]. (R. at 275).

On January 29, 2008, Plaintiff began to visit Kevin McGeehan, D.O. at the John P. Murtha Neuroscience & Pain Institute for treatment and monitoring of his epilepsy. (R. at 292). Dr. McGeehan noted that Plaintiff suffered his initial seizure episode in February of 2007, that an EEG illustrated his predisposition to seizures, and that Plaintiff had been started on Depakote[7] for treatment at that time. (R. at 292). Dr. McGeehan also noted that Plaintiff had lost his insurance shortly after discharge from the hospital, and consequently did not continue with

---

5        Effexor, also known as, "venlafaxine," is a medication used to treat depression, generalized anxiety disorder, social anxiety disorder, and panic disorder. PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000947/ (last visited May 23, 2011).

6        Cymbalta, also known as, "duloxetine," is a medication used to treat depression and generalized anxiety disorder. PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000274/ (last visited May 23, 2011). \

7        Depakote, also known as, "valproic acid," is a medication which may be used alone or in combination with other medications to treat certain types of seizures, mania, bipolar disorder, and ADHD. PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000677/ (last visited May 23, 2011).

medication management of his condition. (R. at 292). Plaintiff did not experience further seizure activity until early January of 2008. (R. at 292). Thereafter, Plaintiff resumed taking five hundred milligrams of Depakote twice a day. (R. at 292). He again was seizure-free. (R. at 292).

Dr. McGeehan noted Plaintiff's history of panic and anxiety, but was informed by Plaintiff that he was taking Xanax[8] and Klonopin[9] to treat the conditions. (R. at 292). Plaintiff admitted to using tobacco products and occasionally drinking alcohol. (R. at 293). He also complained of panic attacks with associated chest pain, heart palpitations, and fatigue. (R. at 293). Depression allegedly produced anxiety, mood changes, and irritability. (R. at 293). Upon physical examination, Dr. McGeehan found Plaintiff to be in no acute distress, with fluent speech, appropriate responses to questioning, normal comprehension, normal repetition, no focal weakness of the extremities, negative Hoffman's and Wartenberg's signs, intact reflexes and sensation, and no difficulty rising from a seated position. (R. at 293). Dr. McGeehan diagnosed Plaintiff with ongoing seizure disorder, and alerted the Pennsylvania Department of Transportation as required by law. (R. at 294).

In February of 2008, Plaintiff reported lower back pain with numbness in his left lower extremity, and sought medication for his pain from Dr. Trostle. (R. at 273). He informed Dr. Trostle that he had been experiencing the pain daily since he was sixteen years old. (R. at 273). He claimed to have taken six hundred milligrams of ibuprofen[10] every four hours without significant pain reduction. (R. at 273). Dr. Trostle was somewhat incredulous that Plaintiff

---

8      Xanax, also known as, "alprazolam," is a medication used to treat anxiety disorders and panic disorder. PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000807/ (last visited May 23, 2011).

9      Klonopin, also known as, "clonazepam," is a medication used alone or in combination with other medications to control seizures and relieve panic attacks. PubMed Health, http://www.ncbi.nlm.nih.gov/pubmed health/PMH0000635/ (last visited May 23, 2011).

10      Ibuprofen is in a class of medications known as, "NSAIDS," and relieves aches and pains, tenderness, swelling, stiffness, and fever. PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000598/ (last visited May 23, 2011).

would have taken such a high dosage of the medication over an extended period of time without experiencing significant stomach irritation. (R. at 273). This was especially so after she suggested taking Naproxen[11], and Plaintiff complained that it would bother his stomach. (R. at 273). Dr. Trostle tested the sincerity of Plaintiff's allegations of pain by watching him jump onto the exam table without any difficulty or evidence of pain. (R. at 273). It was especially noteworthy because Plaintiff is a shorter individual. (R. at 273). The doctor did find significant paraspinal muscle spasm in the lower back, but also noted Plaintiff's negative leg raising test results, excellent leg strength, and intact reflexes and sensation. (R. at 273). Plaintiff ambulated without difficulty. (R. at 274). Plaintiff was advised to use two five hundred milligram Naprosyn[12] a day for his pain. (R. at 274). Dr. Trostle also noted that Plaintiff had suffered another seizure episode in January, and found that a hospital drug screen taken at the time came up positive for amphetamines, marijuana, and benzodiazepines. (R. at 273).

Also in February of 2008, Plaintiff returned to see Dr. McGeehan for a second EEG. (R. at 296). Following the testing, no abnormalities were found. (R. at 296). On March 7, 2008, Dr. McGeehan was contacted by Ms. Miller from the Community Guidance Center regarding possible changes to Plaintiff's Depakote dosing. (R. at 284). Dr. McGeehan recommended against any changes unless further seizure activity occurred. (R. at 284).

Plaintiff returned to Dr. McGeehan's office on April 18, 2008, reporting no incidence of seizure activity. (R. at 289). Plaintiff was still taking Depakote, and noted that he had been experiencing a significant reduction in his anxiety since beginning the medication. (R. at 289).

---

11      Naproxen is in a class of medications known as, "NSAIDS," and relieves aches and pains, tenderness, swelling, stiffness, and fever. PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000526/ (last visited May 23, 2011).

12      Naprosyn is also known as, "naproxen." PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/ PMH0000526/ (last visited May 23, 2011).

As a result, he was discontinuing his use of Effexor, Neurontin[13], and Seroquel[14]. (R. at 289). Upon examination, Plaintiff was in no acute distress and was found to be in the same condition as noted at his last appointment. (R. at 289 – 90). Additionally, Plaintiff was found to have a normal sleep pattern and was experiencing no further problems with anxiety or depression. (R. at 289). His Depakote was determined to be controlling his seizure disorder well, and Plaintiff was tolerating the medication without side effects. (R. at 290).

Dr. McGeehan examined Plaintiff again in December of 2008. (R. at 287). Plaintiff continued to experience no seizure activity, and was continued on his regular dosage of Depakote. (R. at 287). As with the last several examinations, Plaintiff was in no acute distress, exhibited no neurological deficits, had a normal sleep pattern, no difficulties with anxiety or depression, and reported no numbness or weakness in his extremities. (R. at 287 – 88). Plaintiff was tolerating his medication well, and suffered no significant side effects. (R. at 288).

Plaintiff visited Dr. Trostle on April 6, 2009, again complaining of lower back pain. (R. at 266 – 67). However, Dr. Trostle found Plaintiff to have full strength in all extremities, intact reflexes and sensation, and no gait dysfunction. (R. at 266 – 67). Plaintiff was diagnosed with a sprain and/ or strain. (R. at 266 – 67). At that time, Dr. Trostle also noted Plaintiff's major depressive disorder to be in full remission. (R. at 266 – 67).

At Plaintiff's final visit on record with Dr. Trostle in June of 2009, Plaintiff was again complaining of low back pain, weakness and numbness in his arms, an alleged inability to stand more than four hours because of pain, and ineffectiveness of pain treatment. (R. at 264 – 65).

---

13      Neurontin, also known as, "gabapentin," is a medication used to treat certain types of seizures. PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000940/ (last visited May 23, 2011).

14      Seroquel, also known as, "quetiapine," is an antipsychotic medication used to treat the symptoms of schizophrenia, bipolar disorder, and depression. PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001030/ (last visited May 23, 2011).

Upon physical examination, however, Dr. Trostle found Plaintiff's extremities to have full strength, his sensation and reflexes were all intact, and he suffered no gait dysfunction. (R. at 264 – 65). Plaintiff was diagnosed with only neck sprain and strain. (R. at 264 – 65).

Plaintiff also visited Dr. McGeehan for the last time on record in June of 2009. (R. at 281). Plaintiff continued to take his Depakote – at the usual dosage – and had not suffered from continued seizure activity or medication side effects. (R. at 281 – 82). Plaintiff was noted as very compliant with his medication regimen. (R. at 281). As with earlier examinations, Plaintiff was in no acute distress, was without headaches, numbness or weakness in the extremities, or other neurological deficits, had a normal appetite and sleep pattern, and was experiencing no problems with anxiety or depression. (R. at 281 – 82). Plaintiff was noted as taking Zoloft[15] at the time through another provider. (R. at 281).

C. <u>Functional Capacity</u>

On November 21, 2007, a functional capacity assessment of Plaintiff was performed by Dr. Kennedy on behalf of the Bureau of Disability Determination. (R. at 240). Dr. Kennedy noted that Plaintiff arrived on time for his examination, was cooperative and compliant, exhibited good hygiene, ambulated with no disturbance in gait, was well-mannered, and displayed good self-sufficiency. (R. at 240). Plaintiff made good eye contact, and did not exhibit any anxiety. (R. at 242).

Plaintiff described psychological symptoms Dr. Kennedy felt were indicative of PTSD. (R. at 241). Notably, Plaintiff described being sexually molested between the ages of six and fourteen by an older cousin, that he suffered panic attacks and flashbacks, feelings of hopelessness and worthlessness, and a decrease in energy as a result. (R. at 241). Plaintiff stated

---

15      Zoloft, also known as, "sertraline," is a medication used to treat depression, obsessive compulsive disorder, panic attacks, PTSD, and social anxiety disorder. PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001017/ (last visited May 23, 2011).

that he had not reported the abuse until April of 2007, and that he had only just begun individual counseling at the Community Guidance Center. (R. at 241). Past diagnoses included major depressive disorder, PTSD, attention deficit hyperactivity disorder ("ADHD"), and substance abuse. (R. at 241). Plaintiff claimed, however, he had been clean and sober for the four months preceding his examination with Dr. Kennedy. (R. at 241). Dr. Kennedy noted that Plaintiff had never been hospitalized for any mental conditions, and was not on any prescribed medications[16]. (R. at 241).

Dr. Kennedy observed that Plaintiff had a negative outlook with respect to his ability to work. (R. at 242). Plaintiff described his mood as generally anxious and tense. (R. at 243). However, Dr. Kennedy also noted Plaintiff's normal speech, animated affect, appropriate emotional expression, goal directed thought, lack of preoccupation, fair intelligence, full orientation, adequate concentration, impulse control, and judgment, fair insight, and ability to recite his social security number backwards and forwards without difficulty, complete serial threes without errors, and remember two of three items after ten minutes of distraction. (R. at 242 – 43). Plaintiff was unlikely to have problems managing personal funds. (R. at 243).

Plaintiff was diagnosed with PTSD and ADHD, and was given a GAF score of 45. (R. at 244). His prognosis was guarded, but Plaintiff was determined likely to improve with counseling and medications. (R. at 244). However, Dr. Kennedy also found Plaintiff to be markedly limited in the following areas: understanding, remembering, and carrying out detailed instructions, interacting appropriately with the public, supervisors, and co-workers, and responding appropriately to work pressures in the usual work setting, and changes in routine work setting. (R. at 245).

---

16    This statement is in conflict with record evidence indicating that Dr. Trostle prescribed Prozac and Buspar to Plaintiff on August 31, 2007. (R. at 279).

Plaintiff's medical record was then reviewed by stated agency consultant, Grant Croyle, Ph.D. on December 12, 2007. (R. at 247 – 63). Dr. Croyle's mental RFC assessment and psychiatric review technique indicated that, based upon the record, Plaintiff was markedly limited in understanding, remembering, and carrying out detailed instructions, and in interacting appropriately with the general public. (R. at 247 – 63). Plaintiff was otherwise only moderately to not significantly limited. (R. at 247 – 63). Dr. Croyle opined that while Plaintiff exhibited medically determinable impairments in the way of PTSD, ADHD, and polysubstance abuse, he had not been hospitalized for mental disorder, and was capable enough to obtain his GED. (R. at 247 – 63). Plaintiff could make simple decisions and could get along with others in the workplace, as long as there was minimal contact with the general public. (R. at 247 – 63). He could maintain a routine without special supervision, could meet the mental demands of jobs not involving complicated tasks, and was capable of socially appropriate behavior and independent personal care. (R. at 247 – 63).

Dr. Croyle felt that Dr. Kennedy's marked limitations findings with respect to the ability to handle occupational adjustments and personal and social adjustments were incongruent with the evidence on record and Dr. Kennedy's own findings. (R. at 247 – 63). Dr. Kennedy allegedly overstated Plaintiff's limitations. (R. at 247 – 63).

A physical RFC assessment of Plaintiff's abilities was completed by state agency consultant Judith Homison on December 13, 2007. (R. at 167 – 72). Ms. Homison found that Plaintiff suffered from seizure disorder and asthma. (R. at 167 – 72). He had no exertional, postural, manipulative, visual, or communicative limitations. (R. at 167 – 72). However, he would be required to avoid work involving even moderate exposure to fumes, odors, dust, gases, or poor ventilation, and hazards such as machinery and heights. (R. at 167 – 72).

D.  Administrative Hearing

At his hearing, Plaintiff testified that following his tenth grade year of high school, his mother withdrew him from classes because of his recurrent difficulties with illicit drug abuse. (R. at 30 – 31).  Plaintiff attested to abusing alcohol, marijuana, Vicodin, and amphetamines. (R. at 31, 44 – 45).  He was subsequently admitted to Twin Lakes Rehab for a twenty-eight day drug abuse program. (R. at 31 – 32, 46).  He still managed to obtain his GED and to complete nine months of vocational training for motorcycle repair. (R. at 30, 33).  While Plaintiff was employed at various times prior to completing his motorcycle repair training, he did not seek further employment in 2007 after completing the training program because he began to suffer seizures. (R. at 33 – 34).

By the time of the hearing, Plaintiff was on five hundred milligrams of Depakote, twice a day, for treatment of his seizure disorder. (R. at 29).  It was well controlled, as a result. (R. at 28 – 29).  Plaintiff believed the Depakote made him constantly fatigued[17]. (R. at 39).  According to Plaintiff's attorney, there had been no allegations of seizure recurrence since at least December of 2008, although Plaintiff stated that he had not suffered a seizure since February of 2008. (R. at 28, 35 – 36).  Plaintiff's attorney mentioned that the seizures may have been a result of past illicit drug abuse. (R. at 42).  Plaintiff had not held a job since his seizures began. (R. at 33).  Also, Plaintiff's driver's license was suspended due to his seizures. (R. at 36).  While Plaintiff could have had his license reinstated, he was not comfortable with the idea of driving again. (R. at 37).

Plaintiff considered his PTSD to be the greatest barrier to maintaining full-time employment. (R. at 36).  As a result of his childhood sexual abuse, Plaintiff allegedly suffered

---

[17]     During the hearing, the ALJ read aloud from the medical record that Plaintiff had not, in fact, suffered any significant side effects from use of the Depakote, and was tolerating the drug quite well. (R. at 43).  Plaintiff's attorney confirmed this statement as accurate. (R. at 43).

from eight to ten panic attacks per day for forty five minutes to an hour at a time. (R. at 36). Plaintiff needed to keep his mind constantly occupied to avoid thoughts that might trigger a panic attack. (R. at 39 – 40). If Plaintiff suffered a panic attack while at his home, he would retreat to his room; if Plaintiff suffered a panic attack in a public place, he would sit in a bathroom until the attack ended. (R. at 39).

Plaintiff claimed he was never convicted of driving while under the influence of drugs or alcohol. (R. at 37). He also stated that he had stopped using drugs following his stint in rehab. (R. at 38). Plaintiff denied smoking tobacco or drinking alcohol. (R. at 38).

When asked about friends, Plaintiff responded by stating he had no friends – only acquaintances. (R. at 38). Plaintiff claimed to keep to himself, and did not engage in social activities with friends or his family. (R. at 38). The only alleged hobby or interest in which Plaintiff would engage was taking care of miniature chickens. (R. at 40).

The ALJ noted during the hearing that various medical records indicated that Plaintiff suffered from major depressive disorder, anxiety, PTSD, a history of substance abuse, ADHD, and panic attacks. (R. at 44 – 45). Plaintiff had never been hospitalized for any of the aforementioned conditions, however. (R. at 45). Plaintiff was recommended only for individual therapy and medication therapy. (R. at 46 – 47). Additionally, Plaintiff had been diagnosed with epilepsy and asthma. (R. at 47). In response to questioning by the ALJ, Plaintiff's attorney stated that the only conditions which would limit Plaintiff, physically, were Plaintiff's epilepsy, asthma, and fatigue resulting from depression and anxiety. (R. at 47).

Lastly, the ALJ consulted the vocational expert and asked him what jobs would be available to a hypothetical person of Plaintiff's age, education, and work background, but limited to positions requiring no more than frequent lifting of twenty-five pounds and occasional lifting

of fifty pounds, sitting no more than six hours of an eight hour workday, standing for no more than four hours, only simple, routine tasks in a temperature controlled environment with no exposure to noxious fumes, smoke, or excessive heat or cold, no more than occasional interaction with supervisors, co-workers, or the general public, and allowing for up to five days of scheduled absences per year and the ability to be off-task up to five percent of any given workday. (R. at 51).

The vocational expert responded that Plaintiff would be capable of medium exertional employment as a, "retail marker," with 40,000 positions available in the national economy; Plaintiff would be capable of light exertional employment as a, "ticketer," with 39,000 positions available; and, Plaintiff would be capable of sedentary employment as an, "assembler of optical frames," with 16,000 positions available. (R. at 51 – 52). The ALJ then inquired as to whether any jobs would be available if the hypothetical person could not stay on task for any length of time. (R. at 52). The vocational expert replied that no jobs would be available to such a person. (R. at 53).

Plaintiff's attorney then asked the vocational expert if jobs would be available to the hypothetical person with the addition of marked limitations in his or her ability to interact appropriately with the public, supervisors, or co-workers, respond appropriately to work pressures in the usual work setting, and respond appropriately to changes in routine work setting. (R. at 53). The vocational expert explained that no jobs would be available to a person so limited. (R. at 53).

**IV.** **STANDARD OF REVIEW**

Judicial review of the Commissioner's final decisions on disability claims is provided by statute. 42 U.S.C. §§ 405(g)18 and 1383(c)(3)19. Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based, and the court will review the record as a whole. *See* 5 U.S.C. §706. When reviewing a decision, the district court's role is limited to determining whether substantial evidence exists in the record to support an ALJ's findings of fact. *Burns v. Barnhart,* 312 F.3d 113, 118 (3d Cir. 2002).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v. Shalala,* 55 F.3d 900, 901 (3d Cir. 1995)(quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). If the ALJ's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel,* 995 F.Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196 – 97 (1947). In short, the court can

---

18      Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

19      Section 1383(c)(3) provides in pertinent part:
> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

only test the adequacy of an ALJ's decision based upon the rationale explicitly provided by the ALJ; the court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196 – 97. Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 90-91 (3d. Cir. 1986).

To be eligible for social security benefits under the Act, a claimant must demonstrate that he cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months. 42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler,* 786 F.2d 581, 583 (3d Cir. 1986). The ALJ must utilize a five-step sequential analysis when evaluating whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The ALJ must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, Appx. 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §404.1520(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that,

given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986).

## V.    DISCUSSION

The ALJ concluded that Plaintiff had medically determinable severe impairments in the way of asthma, epilepsy secondary to medication, depression, anxiety, PTSD, and polysubstance abuse. (R. at 11).  Plaintiff was determined not to be disabled because he had the functional capacity to perform medium work, but limited to only occasional lifting of fifty pounds, frequent lifting of twenty-five pounds, sitting for six hours of an eight hour workday, standing and walking for four hours, working in an air controlled environment without excessive heat or cold, no more than occasional interaction with supervisors, co-workers, and the general public, no more than simple, routine, repetitive work allowing for being off-task up to five percent of any given workday, and allowing for absences on five scheduled days of work per year. (R. at 14). Consistent with the testimony of the vocational expert, Plaintiff qualified for a significant number of jobs in existence in the national economy. (R. at 14).

In the present case, Plaintiff objects to the unfavorable determination of the ALJ in the following respects: the ALJ improperly disregarded the marked impairments found by state agency examiner Charles J. Kennedy, Ph.D. – which would have rendered Plaintiff unable to perform a significant number of jobs in the national economy – instead, relying upon Plaintiff's lack of mental health treatment and the isolated opinions of two non-mental health professionals to find Plaintiff could maintain substantial gainful employment; the ALJ's hypothetical to the vocational expert and residual functional capacity ("RFC") assessment were fatally flawed

because all of Plaintiff's credibly established functional limitations were not included therein; and, as a result, the decision of the ALJ was not supported by substantial evidence from the record.

With respect to the assessment by Dr. Kennedy, Plaintiff specifically claims that the record evidence supported his findings of marked limitations in interacting with the public, supervisors, and co-workers, as well as marked limitations in responding appropriately to pressures in the usual work setting and to changes in routine work settings. (ECF No. 9 at 5 – 10). In addition to Plaintiff's other limitations as described by the ALJ, these marked limitations rendered Plaintiff incapable of maintaining substantial gainful employment as per the testimony of the vocational expert at Plaintiff's hearing. (*Id.*). To support the credibility of these limitations, Plaintiff cites to his reported history of sexual abuse, panic attacks, fear of being alone, seizures, inability to maintain attention and focus, inability to handle stress, and depression. (*Id.*). The ALJ allegedly did not account for this evidence when failing to adopt Dr. Kennedy's findings. (*Id.*).

When rendering a decision, an ALJ must provide sufficient explanation of his or her final determination to provide a reviewing court with the benefit of the factual basis underlying the ultimate disability finding. *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981) (citing *S.E.C. v. Chenery Corp.*, 318 U.S. 80, 94 (1943)). The ALJ need only discuss the most pertinent, relevant evidence bearing upon a claimant's disability status, but must provide sufficient discussion to allow the court to determine whether any rejection of potentially pertinent, relevant evidence was proper. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 203 – 04 (3d Cir. 2008) (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000); *Cotter*, 642 F.2d at 706). In the present case, the ALJ adequately met his responsibilities under the law.

Plaintiff argues that Dr. Kennedy's findings were consistent with the findings of mental health professionals on record, and that Plaintiff was incorrect in assigning the findings little weight. (ECF No. 9 at 6 – 10). However, Plaintiff does not cite to any mental health professionals to support the opinions of Dr. Kennedy, because aside from Dr. Trostle, Dr. McGeehan, and Ms. Miller, there were no other mental health professionals making findings. Dr. Croyle, another state agency evaluator, specifically found Dr. Kennedy's findings to be out of proportion to Plaintiff's actual limitations. (R. at 247 – 63). Dr. Kennedy even explicitly provided in his own RFC assessment that Plaintiff was likely to improve with therapy and prescription medication, and Dr. Trostle and Dr. McGeehan's records bore this out. (R. at 244).

Plaintiff does cite the Disability Report from the social security field office which indicated that Plaintiff had difficulty with questions during a face-to-face interview, for support. (ECF No. 9 at 6). However, no difficulties were ever noted when Plaintiff was interacting with his treating sources or with the ALJ at the administrative hearing. (R. at 13, 226, 240, 266 – 67, 273 – 75, 277 – 79, 281 – 82, 287 – 90, 292 – 94). Further, Plaintiff was never hospitalized for psychiatric disorders or referred for such hospitalization, and the record provided no evidence of individual counseling sessions, despite the recommendation of Plaintiff's treating physicians. (R. at 12 – 19, 277 – 78).

With respect to Plaintiff's allegations of panic attacks, none of Plaintiff's treating sources indicated specific functional limitations resulting from the alleged attacks. Moreover, Plaintiff explained that since taking Depakote, he experienced a significant decline in feelings of anxiety. (R. at 289). Plaintiff made contradictory statements about the severity of his panic attacks – stating to his doctors and in his application materials for SSI and DIB that he had only three to four attacks per day; at the administrative hearing, Plaintiff stated that he suffered eight to ten

attacks per day. (R. at 13, 163, 226). He also made contradictory statements when he claimed that he could not work alone because it might trigger panic attacks, but also explained that he preferred to be alone. (R. at 13). Moreover, Plaintiff was capable of spending significant time interacting with his friends and family, and helped his friends take care of animals. (R. at 13, 155 – 63).

With respect to the ability to maintain concentration and focus, the ALJ reiterated Dr. Kennedy's own findings that Plaintiff was capable of reciting his own social security number backwards and forwards without errors, was able to complete serial threes without errors, and remembered two out of three items after ten minutes of distraction. (R. at 13). In terms of handling stress and completing tasks, Plaintiff was able to obtain his GED after withdrawing from high school, and was able to complete a nine month training program to become a motorcycle mechanic. (R. at 13).

Despite all of Plaintiff's claimed limitations, he also was capable of leaving the house – independently, on a daily basis, he could perform his own shopping – even taking time to window shop, he could care for his personal hygiene, he could perform household chores for his parents, he could hunt, and he could care for his own miniature chickens. (R. at 155 – 63).

While Plaintiff stated that he did not look for work following completion of the motorcycle training course due to the onset of seizures, the record shows that Plaintiff's seizures were well controlled and that he did not suffer significant side effects from his medications. (R. at 281 – 82, 287 – 90). EEG diagnostics in 2008 showed no abnormal brain activity. (R. at 16 – 18).

Lastly, two of Plaintiff's treating physicians, Trostle and McGeehan – with significant longitudinal treatment histories – indicated that Plaintiff's depression was in full remission, and

that he did not experience problems due to anxiety or depression. (266 – 67, 281 – 82, 287 – 90). Considering all of the above, Plaintiff has not made a persuasive case that the ALJ's decision was not supported by substantial evidence, and that Plaintiff was as limited as Dr. Kennedy indicated.

Plaintiff next argues that the ALJ improperly held Plaintiff's lack of mental health treatment against him, because it was Plaintiff's loss of health insurance that prevented him from securing proper mental health treatment and medications. Yet the record reveals this assertion to be without merit. For a period spanning 2007 until 2009, Plaintiff consistently received treatment from his primary care physician, Dr. Trostle, and his neurologist, Dr. McGeehan, and received prescription medications from both of them – without interruption – for the entirety of that period. The only indication on the record that a lack of health insurance precluded Plaintiff from receiving treatment is a note by Dr. McGeehan stating that Plaintiff was unable to take Depakote for an unspecified period after his initial release from the hospital in 2007. (R. at 292). Despite this lack of medication, Plaintiff did not suffer another seizure for several months. When he did, the record indicated that Plaintiff was immediately placed back on Depakote without any showing that at that time – or any time thereafter – Plaintiff had difficulty receiving treatment due to a lack of insurance coverage. (R. at 292).

The record clearly supports the ALJ's conclusion that Plaintiff did not seek the aid of a mental health professional, where only one document evidenced a single visit to the Community Guidance Center. (R. at 226). Yet following that time, Plaintiff was able to receive medical treatment from two other doctors – including prescription medications. Plaintiff's argument regarding a lack of insurance acting as a barrier to greater mental health treatment is, therefore, unavailing.

Plaintiff next attacks the ALJ's reliance upon the findings of Drs. Trostle and McGeehan because it is the policy in this circuit that longitudinal physician evidence be favored over one-time examinations. (ECF No. 9 at 12). Here, Plaintiff refers to the finding by Dr. Trostle that Plaintiff's depression was in full remission, and the finding by Dr. McGeehan that Plaintiff suffered no problems from his depression and anxiety as evidence of, "snapshot," assessments that should not be given great weight. (*Id.*).

With respect to treating physicians, the Court of Appeals for the Third Circuit has held that a treating physician's opinions may be entitled to great weight – considered conclusive unless directly contradicted by evidence in a claimant's medical record – particularly where the physician's findings are based upon "continuing observation of the patient's condition over a prolonged period of time." *Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, 355 (3d Cir. 2008); *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (citing *Rocco v. Heckler*, 826 F.2d 1348, 1350 (3d Cir. 1987)). However, a showing of contradictory evidence and an accompanying explanation will allow an ALJ to reject a treating physician's opinion outright, or accord it less weight. *Id.*

Plaintiff's argument is paradoxical, because he wishes the court to favor the one-time evaluation of Dr. Kennedy over the treatment records of Drs. Trostle and McGeehan. It must first be noted that Dr. McGeehan – a neurologist – made multiple findings over the course of many months of treatment stating that Plaintiff suffered no problems as a result of his depression and anxiety. More to the point, however, and as earlier discussed, Drs. Trostle and McGeehan have consistent treatment records chronicling Plaintiff's gradual mental and physical improvement over the course of several years. This clearly entitles their findings to significant weight – particularly where the findings of Dr. Kennedy are specifically called into question by

another state agency evaluator. As such, the ALJ's reliance upon Drs. Trostle and McGeehan, and his determination that Dr. Kennedy's findings were entitled to little weight, was not improper.

Further, Plaintiff's reliance upon *Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, is flawed, because Plaintiff is the party attempting to use the isolated findings of one examiner, made in 2007, to override the findings of two treating physicians made during multiple visits spanning 2007 to 2009. It is Dr. Kennedy's assessment which is the, "snapshot," here. And, it is that snapshot which the ALJ and this court reject.

In terms of the ALJ's hypothetical to the vocational expert and subsequent RFC assessment, in light of the above discussion, it is clear that the ALJ provided a thorough analysis of the medical evidence underlying Plaintiff's claim for disability benefits. Having provided significant record evidence to support his rejection of Dr. Kennedy's aforementioned marked limitations findings, this court can conclude nothing other than that all the credibly establishing medical impairments suffered by Plaintiff were properly incorporated into the hypothetical to the vocational expert and were accommodated fully in the ALJ's RFC assessment. Therefore, the ALJ's hypothetical and RFC assessment were not flawed.

# VI.   CONCLUSION

Based upon the foregoing, the decision of the ALJ is adequately supported by substantial evidence from Plaintiff's record.   Reversal or remand of the ALJ's decision is not supported. Accordingly, Plaintiff's Motion for Summary Judgment is denied, Defendant's Motion for Summary Judgment is granted, and the decision of the ALJ is affirmed.   An appropriate Order follows.


*s/ Nora Barry Fischer*
Nora Barry Fischer
United States District Judge


Dated: May 25, 2011
cc/ecf: All counsel of record.